I'm representing Mr. Cisneros. Just a note, I'm going to try to save two minutes for rebuttal, and I'll try to keep track of my time. Unless the Court has other preferences, I'll start with the issue of the nighttime execution of the warrant. The Government doesn't argue there are no Fourth Amendment or Rule 41 limitations on nighttime execution of a warrant, where there's an intrusion like there was here. And I just, before you get too far down the road, are you arguing this under Fourth Amendment or Rule 41? Both and the alternative, Your Honor. I'm making both arguments. And I think nighttime searches certainly are more intrusive, which is why it's important to have a different standard. This case is, frankly, a very dramatic illustration of that. What you had here were eight family members, including an elderly man and three children, who were woken out of their sleep, rousted out of bed in their nightclothes, and taken outside to stand shivering in the night. That's what we're talking about when we talk about whether we're going to apply a greater standard and what that standard should be. I would think that because of what the affidavit indicated in this case, that at the very least there would be a Leon good-faith excuse for just doing what the search warrant said. Right. And with the gang involvement and the guns and the murder, that probably a nighttime search would be okay. I don't really see why it's so hard. I guess I disagree, Your Honor. Tell me why. Tell me what I'm missing. First of all, I think there's a basic issue about whether danger alone can ever be a justification for a nighttime search as opposed to lots of evidence. Wait a minute. If you think people are going to shoot at you, it's kind of nice to get the drop on them by coming when you're awake and they're asleep. On the other hand, Your Honor, if you wake someone right out of a dead sleep and they don't know completely what's going on, they may be more likely to get violent. So I don't know that it's necessarily clear-cut. The only federal case that does suggest that danger alone is enough is the Kelowna case. All the other federal cases, which I cite in my reply brief, talk about loss of evidence or the evidence may disappear or it may be being destroyed. And when there is an issue of danger, Your Honor, they focus very much on specific factors about that defendant and reasons to think that defendant may get violent with the police. Why wouldn't Leon take care of it, even if you're right? I don't think Leon takes care of it, Your Honor, because there are two cases, Holtzman and Hove, that I cite in my brief that basically stand for the proposition that silence of an affidavit on a point means you can't go to good faith. And you basically have silence here as to the danger issue. There is absolutely nothing in the affidavit. Granted, it's attempted murder and a gang member, but there's nothing in the affidavit about this specific defendant specifically being a danger to the police. Absolutely zero. There is also absolutely nothing in the affidavit about any times of day other than at 7 a.m. creating a danger to people in the community. Could you just address, based on the propensity for violence on the part of Rene Cisneros? And I don't think just that, I guess what I'm saying is Who would the violence be directed against? Well, presumably directed against the police and neighbors might be, I mean, I guess probably directed against the police. But I think they have to make more than a statement of general propensity. I mean, what the case law says, the Kelowna case had this on its facts, and the California cases, which are the cases the district court relied on, point this out. There has to be a particular and specific reason for nighttime service. And in the context of danger, the particular defendant is prepared to use deadly force against officers executing the warrant. Well, here, though, let's assume that we'll take out for a minute whether or not there was enough alleged danger to the officers, although there is a reference to propensity for violence of not only Cisneros himself but the gang. But there's then also the discussion of the location being in a residential area near a street or on a street where later in the morning there would be schoolchildren going to school and traffic. And on the face of it, I know you disagree. You say, well, you know, our investigators go out and show that there are only a few students. It's overstated. But the magistrate or the state judge in this case is looking at that, and it's not just the danger to the officers, but it's also in the circumstances of the area where it's located. So given that and the judge goes forward with the warrant, then why isn't Judge Kleinfeld's question to the point? Two reasons, I think, Your Honor. First of all, to rely on that, there would have to be findings on the dispute between my investigator and the officer, that Frank's findings would have to be made at the very least. Second, it doesn't address why you can't do it at 2 o'clock in the afternoon, why you can't do it at 5 o'clock in the afternoon, why you can't do it at 8 o'clock in the evening. The affidavit talks only about 7 a.m. And even if you were to extrapolate to maybe other times in the morning or maybe sometimes in the afternoon, I don't think there's any way to extrapolate that to the early evening hours. And so there's no explanation. The affidavit is basically absolutely silent as to those other time periods. And then I think the good faith argument runs into the Holzman and Hove cases. So I think that's why good faith doesn't work on the nighttime search issue, which, by the way, is the only place the government raised it below. And so I think the only place it can rely on good faith on this appeal. Mr. Gunn, you depend quite heavily on this 10th Circuit case, Kelowna, right? Actually, I'm distinguishing. Kelowna is one of three or four federal cases that hold there's a nighttime execution limitation under the Fourth Amendment. And then I distinguish Kelowna on its facts. I point out that it has specific facts. Distinguish it, though. What distinguishes this case from Kelowna? They seem to me to be quite similar. Several things, Your Honor. In Kelowna, there was a specific showing that that defendant was violent with the police. He had arrests for assault on a police officer, arrests for failing to stop for a police officer. This guy had several arrests, right? In fact, he was wanted for shooting somebody. Well, he was wanted for shooting another person, but nothing about violence with the police. And that's, I think, what needs to be present in the affidavit. That's certainly what was present in Kelowna. It has to be directed specifically at the police? I think so, to start making an assumption. Otherwise, you're going to basically have an attempted murder, I guess attempted murder gang member exception to the nighttime execution requirement. I think that sweeps too broadly. Could you answer one more little thing for me? All right. Suppose hypothetically, we have not conferred, we don't confer before arguments, but suppose hypothetically you were not to prevail, would the appellant be entitled to an ammaline remand or would it be unnecessary because the judge said he would give the same sentence even if the guidelines were inapplicable? I think he would be entitled to an ammaline remand for at least two reasons. First of all, and by the way, first of all, you have to remember it's not really ammaline because we're talking about harmless error analysis here, not plain error analysis. And ammaline was about plain error, which is a higher standard. But second, what the court actually said was not the same sentence. It said the same range. And that at least suggests there may have been a range within which there might have been some moving. More important, I think, in this case is I was precluded by the plea agreement and so I made absolutely no argument for a sentence of less than 168 months. After Booker, I can argue for less than 168 months on Booker factors. How about the government? Can they argue for a career offender enhancement now? Probably. And your client's okay with taking that chance? I think so. Wait a minute. You think so? I, my recollection. We have remanded cases, you know, with the mandate that, let me finish, with the mandate that we be advised whether the defendant wants an ammaline type of remand. So to think so isn't the same as he does that. I have to look back at my notes of telephone conversations, Your Honor. My recollection, I'm 95 percent sure I specifically discussed that with him either right before or right after I filed the opening brief. I can certainly confirm that for the court. I would note that I think under a remand, well, under an ammaline remand, there has to be, I think, a finding by the district court that he would have or at least a substantial possibility that he would have imposed a lower sentence. Otherwise, there's no errors to the defendant. There's only errors to the government if they had raised the issue, which they haven't here. So. I want to ask you one more question. Now, you say a remand of some kind is required because all that Judge Blue said was, well, this sentence, within the range of what I would do, right? And that left too much room? Is that your position? Yes. I think his words were different. Something like that. Within the range of sentences that the court would impose. That's what he said. Now, but ammaline only says you need a remand if it would be, I forgot the exact words, but it would be substantially different or something like that. And I, but it seems to me within the range is not any different than saying, well, it wouldn't be substantially different. Well, first of all, we're not talking about. Isn't there something like that, that ammaline? I don't specifically recall that. If the word substantial is in there, Your Honor, I would suggest it comes out of the quote substantial rights unquote language that goes with plain error. And here we're talking about harmless error. So even if that is the language of ammaline, I don't specifically recall if it is. I don't think it would be enough. I was going to try to address that. I think the gun issue about leaving things out that they knew about. You don't waive anything because it wasn't argued. Very good. Thank you. Thank you, counsel. Actually, ammaline referred to a materially different sentence. That's the word, materially different. All right. And then I. We understand that the oral argument is mainly us asking you questions. You don't waive the gun issue. You argued it in the briefs. Counsel. May it please the Court. Eric Silber on behalf of the United States. Turning first to the nighttime search issue. Although this was originally a state search and they sought a state warrant in this case, they did seek authorization for nighttime search and the California statute, California Penal Code Section 1533, has essentially the same standard. It's both a good cause standard and a federal requirement in this case. I mean, in essence, the State did what was required of the 41. They went before a neutral 41 speaks of magistrate general, but it was a judge in this case. They presented the reasons why they had good cause for a nighttime search and the judge in this case authorized. What was this showing aside from propensity? Well, I don't think it was a mere propensity. First of all, you have the nature of the crime itself was not simply a propensity for violence. It was a propensity to shoot someone with a gun, at least in the knock and announce cases, which is a similar type of intrusion into the home. What this Court has looked at is not simply whether the defendant possessed a gun, but whether there's legitimate reason to believe that he used a gun. And that's, for example, in the Bynum case. I think by the nature of the offense itself, given that he shot an individual with a gun, they certainly had reason to believe that this defendant would, in fact, use the gun. Well, isn't that true of any kind of search where there's a belief that the person located within the premises may be armed? I mean, nighttime searches, at least looking at the cases that I've looked at, there are very few that justify just on officer safety. Usually it's destruction of evidence or something like that. What's the case that says all you have to have is a dangerous defendant and you can go in without more on nighttime search? Well, certainly Colonna, the 10th Circuit case, dealt with that. In fact, Colonna made clear that what you would look at is the same kind of justifications as you would for knock-and-announce. Certainly in the knock-and-announce context, this Court has looked at danger repeatedly, and it's hard to see the difference. Both are intrusions into the home. Both are more significant than your normal context. In a knock-and-announce, this Court, again, in Bynum, since doors are usually locked, when you say no knock-and-announce, you're breaking down someone's door, breaking their window. You're catching them off guard and trying to give their home. That's a significant intrusion. I mean, this is an intrusion as well. It's at nighttime. You're surprising them. They are coming outside while the search is going on. Sorry, go ahead and finish your sentence. It's a similar type of intrusion. I certainly would be anomalous to say you couldn't look at danger. I think the reason cases have looked. No, I'm not saying you can't look at danger, but what else is it? These cases always have something else besides danger. Well, I disagree. Like destruction of evidence or some other factor. I believe in Kelowna there was just the danger to the officers. Now, it's true in that case that there was some evidence that the defendant there had. Well, that may be. But in this case, I think it's a generous reading of the declaration or the affidavit to say it was danger to the officers. It really was focused on danger to the public. I disagree only to some extent because it's important to remember that this is under California Penal Code Section 1533. And by law, under California Penal Code Section 1533, the magistrate was required to consider the safety of both of the officers and to the community. So I think as long as the facts were in the warrants, that the facts should be considered by the magistrate, and in this case, a judge. There's no express statement, I think, required to say we feel in danger in this circumstance, given that it's something that the judge had to look at by law under the California statute in which they sought. Counsel, I don't want you to go through all your time on the one sentence. Let me ask my question. We've been discussing this so far in terms of an affidavit showing that somebody in the premises was armed. Is my recollection wrong? I thought what happened was Cisneros' son shot a friend of his in the head. He wasn't just armed. He shot a guy in the head, execution style. That's exactly right. Is that right? That's exactly right. I'm thinking in my community, the community where I live, virtually everybody is armed. And it's just local custom. No, literally. Under law, that's everybody carrying a gun. But not everybody shoots somebody in the head. I think that's what this Court made clear in Bynum in the knock-and-announce context. It's not enough that someone possesses a gun. That doesn't show that they're willing and able to use it. But the nature of the offense in this case in particular would show that this defendant was willing and able to use it. You also have to judge in the context of his participation in a violent gang, which is in the affidavit, suggests this was not out-of-context behavior by this individual. Also important to recognize that the affidavit describes the individual he shot as his best friend, which suggests that if he's willing to shoot his best friend, he's willing to shoot anyone, frankly. So, I mean, I think the police had a reasonable ground to believe they were in danger in this circumstance. At a minimum, given that the California statute required the judge in this case to look at the dangers of the officers, and given the statements that are in the affidavit, it seems to me that there is at least a good faith basis to believe that this search was warranted. And once the authorization was received, that it was appropriate for the officers to rely on it. I mean, this is not like most of the cases where this actually has arisen where there was no attempt to seek a nighttime authorization after the fact. There's a question about whether there was or was not good cause.  Yes, Your Honor. In this case, there was some uncertainty when they were sentencing this case, obviously. Blakely had come down, and as had Ammaline, one, but no. The judge said if this was a pre-guidelines case, I'd sentence in the same range. Does that mean that we should send it back with our usual Ammaline-type order where the judge decides whether he would have sentenced differently and whether to vacate and resentence or not? I respectfully disagree in this case. Why not? It's not going to be warranted. I mean, the Court gave this statement as a backup in case the guidelines were invalidated and said this sentence would be within the range of sentences it would have given. I think that's, in Ammaline, what this Court looked at is whether the sentence would have been materially different. And that speaks to the same thing. What about Mr. Gunn's point that, well, Ammaline was a plain error case, and this is not? Well, but the difference between harmless error and plain error is simply who bears the burden of proof. It's not really the showing. There was no constitutional error in this case. I mean, the Court didn't rely on the career offender provision specifically because it was required to make findings of fact. The question is just whether the sentence would have been different, whether you could know from the record. And if it's plain error, it's the defendant who bears the burden of proof. If it's harmless error, it's the government. But this question is still the same, whether the sentence would have been materially different. And in this case, the sentence wouldn't have been materially different, at least that's not what the record suggests. I mean, the Court, if anything, thought it had more discretion than ultimately does because it believed that the sentencing guidelines may be invalidated, that the Sentencing Reform Act may be invalidated in its entirety. It said this was a backup in case that happened. And it said it was within the range of sentences that it would have given, which I think suggests that it was looking at a range of sentences for this crime and that this was the sentence it thought was appropriate. So what's the range is a term of art. I mean, range is a fairly broad number of months here, isn't it? Is he referring to the guideline range, you know? I think it's clear that he's not referring to the guideline range. My interpretation of it, he was referring to the range he would have given before the Sentencing Reform Act was in place. I mean, I do think people had in their mind. What about the argument your adversary makes that he would have argued the case differently had the guidelines not been mandatory? I disagree with that. He had every reason in this case to put in facts that would warrant the low end of the guideline range. And, in fact, he did that in this case in a number of instances. So, I mean, it's particularly true in a context like this where the career offender provision only didn't apply because it required a jury finding the defendant was 18 at the time of the offense. So, in other words, it was quite clear that the career offender facts applied to this, even if the guideline provision didn't. I'm kind of surprised the sides aren't switched here. I would think that you would want to vacate the sentence and get a resentencing because the cap comes off and the defendant would want to hold on to what he's got. Well, certainly we didn't appeal, so I don't think we're in a position to ask this court for any relief based on what happened at sentencing. But I do think, given what the court said, the sentence, there's no reason to believe the sentence would be materially different. I mean, there certainly is a danger in this case if it goes back. The defendant is going to start off with a guideline range that's 20 months higher than it ultimately was, and there's a danger that the sentence is going to be higher in this case. You don't feel bound by anything that's happened in this case so far, and not to ask for something higher? No, in fact, we noted in our brief that if the case were remanded, that we may raise the career offender. I mean, I think the problem here is it's clear that the career offender provision does apply, and the only reason that it didn't, and everyone agreed in the district court, before Blakely and Ameline, that it did apply. The only reason it ultimately didn't was because there is a factual finding embedded within the career offender provision, and that's that the defendant is 18 at the time of the incident of offense. And that was the only reason it didn't apply in this case. Now, of course, Ameline 1 is no longer controlling, and the court is able to make factual findings in sentencing. It just has to be factual findings within a discretionary guideline system. So it seems to me the career offender provision would apply here. But I do think Ameline makes a defendant's election. I mean, if he wants to go back, at least if there's – I see my time is up. May I finish my sentence? Sure. At least in a situation if it would otherwise – there was some indication the sentence would be materially different. If he wants to elect that, that's his choice. I just don't think in this context there's any reason to believe it. Okay. Thank you. United States – oh, I think – I can't remember, but take 30 seconds or a minute for rebuttal. Just two quick points. One, on the difference between harmless error and plain error, it's not just the burden. Plain error also requires the showing of effect on, quote, substantial rights, unquote, which I don't think harmless error does. Just any error is harmless error. Second, there was a comment about this was someone who was willing to shoot their best friend. It's not quite that simple. Like, some sort of, you know, crazy person like that is willing to shoot a best friend who he thought had killed his brother. That makes it obviously not a good thing, obviously a crime, but not sort of so out of the ballpark that you're going to say someone must be willing to shoot a policeman. Of course, it was after he talked to his dad, too. Wasn't his dad on the other end of the phone? Well, after he called his dad and said, I'm coming home alone. And then said something pejorative after he got off and shot. Not pejorative about a person, just pejorative about – We don't know. Pardon me? I don't know. Anyway, one could infer that the dad was complicit. Maybe? I don't think so. Okay. All right. Thank you, counsel. The United States District of Consumers is submitted.
judges: Kleinfeld, Tashima, Fisher